JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Christopher McShea

**DEFENDANTS**

JJLH of Trevose, LLC d/b/a Faulkner Volvo

**(b)** County of Residence of First Listed Plaintiff    Camden
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Bucks
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Matthew A. Luber, Esq., McOmber McOmber & Luber
39 E. Main Street, Marlton NJ 08053, 856-985-9800

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
     Plaintiff

☐ 2   U.S. Government
     Defendant

☒ 3   Federal Question
     *(U.S. Government Not a Party)*

☐ 4   Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - |    of Property 21 USC 881 | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |    Product Liability | ☐ 690 Other |    28 USC 157 |    3729(a)) |
| ☐ 140 Negotiable Instrument |    Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & |    Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|    & Enforcement of Judgment |    Slander |    Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |    Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |    Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|    Student Loans | ☐ 340 Marine |    Injury Product | |    New Drug Application | ☐ 470 Racketeer Influenced and |
|    (Excludes Veterans) | ☐ 345 Marine Product |    Liability | | ☐ 840 Trademark |    Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |    Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending |    Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract |    Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) |    Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal |    Property Damage |    Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |    Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - |    Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| |    Medical Malpractice | |    Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** |    Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee |    Income Security Act |    or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party |    Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ |    Sentence | |    26 USC 7609 |    Agency Decision |
| ☐ 245 Tort Product Liability |    Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | |    State Statutes |
| |    Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |    Other | ☐ 550 Civil Rights |    Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | |    Conditions of | | | |
| | |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
     Proceeding

☐ 2   Removed from
     State Court

☐ 3   Remanded from
     Appellate Court

☐ 4   Reinstated or
     Reopened

☐ 5   Transferred from
     Another District
     *(specify)*

☐ 6   Multidistrict
     Litigation -
     Transfer

☐ 8   Multidistrict
     Litigation -
     Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 12101, et seq ("ADA"); 29 U.S.C. 2601, ("FMLA")

Brief description of cause:
Plaintiff is alleging disability discrimination, retaliation and FMLA violations

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
in excess of $75,000

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
08/06/2020

SIGNATURE OF ATTORNEY OF RECORD
/s/ Matthew A. Luber

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHRISTOPHER McSHEA, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | |
| JJLH OF TREVOSE, LLC d/b/a FAULKNER VOLVO, | JURY TRIAL DEMANDED |
| Defendant. | |

## COMPLAINT

Plaintiff Christopher McShea ("Plaintiff"), by way of this Complaint against Defendant JJLH of Trevose, LLC d/b/a Faulkner Volvo ("Defendant" or "Defendant Faulkner") alleges as follows:

## INTRODUCTION

1.      This case concerns an employer focusing on its bottom-line and turning its back on an employee at the time the employee needed its support and employer-based medical insurance the most.  With an immunocompromised child at home, on any given day, Plaintiff and his family must take significant precautionary measures to ensure they do not encounter individuals or surfaces that could spread infectious disease.  This concern was significantly amplified by the recent COVID-19 pandemic, which, in March 2020, began to precipitously intensify in Pennsylvania and across the United States.  As a result, Plaintiff, a sales manager employed by Defendant for more than 15 years, made several requests to management to work from home to avoid unnecessary contact with members of the public and co-workers who could potentially transmit the virus to Plaintiff and, in turn, to his son.  As discussed below, not only did Defendant reject Plaintiff's reasonable accommodation request, neither the dealership nor management took

1

proper precautions to avert the spread of the virus among employees and they forced him to continue to come to work **on site** as the pandemic escalated and even **after** Pennsylvania had ordered all non-essential business, including Defendant, to be shutdown.

2. Even worse, after Plaintiff continued to voice his concerns regarding Defendant' internal handling of the pandemic and his accommodation request, the company suddenly terminated his employment under the guise he was being temporarily "furloughed" and in a deliberate effort hide the true reason for his termination – unlawful discrimination and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. 2601, ("FMLA"), Americans with Disabilities Act, 42 U.S.C. § 12101, et seq ("ADA"), Families First Coronavirus Response Act, PL 116-127 ("FFCRA"), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 ("PHRA").  Defendant Faulkner's conduct not only is shameful, it is against the law.  Plaintiff accordingly brings this Complaint.

## PARTIES, JURISDICTION, VENUE

3. Plaintiff is an individual residing at 17 Kirkwood Road, Gibbsboro, New Jersey 08026.  At all relevant times, Plaintiff was employed by Defendant Faulkner as a Sales Manager at the Volvo dealership located at 4429 Street Rd, Feasterville-Trevose, PA 19053.

4. Defendant Faulkner is headquartered in Pennsylvania.  At all times relevant hereto, Plaintiff worked at Defendant Faulkner's location 4429 Street Rd, Feasterville-Trevose, PA 19053. Defendant Faulkner is an "employer" as defined by the FMLA, ADA, and FFCRA.

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343 and 29 U.S.C. § 2617.

6. This action properly lies in this District pursuant to 28 U.S.C. §1391.

7.       The unlawful acts and practices of Defendant Faulkner were committed within or upon the direction of Defendant Faulkner's agents, servants, employees and/or representatives within the Commonwealth of Pennsylvania and within this District.

8.       On or about April 15, 2020, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with the Pennsylvania Human Relations Commission ("PHRC"). Attached as Exhibit "A" is a true and correct copy of Plaintiff's Charge of Discrimination.

9.       On or about July 22, 2020, the EEOC issued Plaintiff a Notice of Right to Sue. Attached as Exhibit "B" is a true and correct copy of Plaintiff's Notice of Right to Sue.

## FACTS COMMON TO ALL CLAIMS

10.      Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

11.      The Equal Employment Opportunity Commission ("EEOC") enforces workplace anti-discrimination and -retaliation laws including those under the FMLA, ADA, and FFCRA.

12.      Defendant Faulkner is subject to the FMLA, ADA, and FFCRA.

13.      Defendant Faulkner employs more than 50 employees.

14.      Defendant Faulkner is a family-owned group of automotive dealerships serving the Philadelphia, Bucks County, Harrisburg, and Huntingdon Valley, Pennsylvania areas.

15.      Although Defendant Faulkner boasts "our family extends beyond the Faulkner family—Our employees and customers are treated as part of our family. We're proud to serve communities across Central and Southeastern Pennsylvania the best vehicles and service," the company pretextually terminated Plaintiff's employment immediately after (i) he reported he was uncomfortable working onsite due to Defendant Faulkner's failure to implement/follow basic

precautionary measures to minimize the risk of COVID-19 infections, and/or (ii) he reasonably requested an accommodation to work remotely to alleviate unnecessary risk to himself during the pandemic and to his immunocompromised son.

16.     Defendant Faulkner also engaged in a concerted effort to mask the discrimination and retaliation by "furloughing" Plaintiff as a result of the coronavirus pandemic when, in reality, the company had already made the decision to terminate him under the guise of poor "performance."

### Plaintiff's Employment with Faulkner--Generally

17.     Plaintiff had been employed with Defendant Faulkner for approximately 15 years prior to his termination in March 2020.

18.     Plaintiff was an excellent employee with positive reviews and no disciplinary history.

19.     Plaintiff was employed as the Finance Director at Defendant Faulkner's Toyota dealership form 2010 through 2013. In that position, Plaintiff's duties included procuring finance applications, improving net dollars on finance deals, assisting with the sale of insurance products, and training finance managers within his department.

20.     In 2013, Plaintiff was transferred to the "New Car Department," where he handled vehicle allocation from the manufacturer, strived to improve gross dollars per vehicle sale, trained sales personnel, and improved overall sales for the Toyota dealership.

21.     In October of 2017, Plaintiff was again transferred to the Faulkner Volvo dealership to become the Sales Manager.  At the time of his transfer, the Faulkner Volvo dealership had struggling sales, did not have a finance manager, and did not have a stable General Manager.  This

required Plaintiff himself to complete customer paperwork, report deals to the bank, obtain contract approval, and sell insurance related products, among other things.

22.     Plaintiff was one of the few key employees at the dealership that could handle front-end sales, back-end financing, and manufacturing work.

23.     During his tenure as Sales Manager for the Volvo dealership, Plaintiff was able to double the dealership's average monthly sales.

24.     As a result, Faulkner Volvo won the "Excellence Award" in 2018 and 2019, a mark achieved by only 30 dealerships across the United States.

### Plaintiff's Son's Medication Condition

25.     Plaintiff's six-year-old son, ("BM") has Hypoplastic Left Heart Syndrome ("HLHS"), a rare medical condition and congenital birth defect where the left side of the heart is either not developed or is underdeveloped.

26.     As a result of the condition, the left side of BM's heart is unable to effectively pump blood to the body. Instead, the right side of the heart must pump blood to the lungs and to the rest of the body.

27.     Significant daily medication is necessary to prevent closure of the connection (ductus arteriosus) between the right and left sides, followed by either surgery or a heart transplant, in order to treat hypoplastic left heart syndrome.

28.     Due to HLHS, BM has already endured three open heart surgeries, multiple cardiac catheterizations, a lymphatic procedure, plural effusions, and the development of PLE (protein loss enteropathy), among other complications.

29.     BM takes six medications daily, which are necessary for palliative care and his survival.

30.     One of BM's medications must be obtained through a specialty pharmacy and the medication costs approximately $6,000 per month.

31.     As a result of BM's medical condition, on a daily basis, Plaintiff and other members of his family have no choice but to mitigate against germs, bacteria, and other substances that could transmit or lead to infection.  That is, irrespective of a pandemic, BM was particularly vulnerable to viral infections.

32.     In addition to HLHS, BM is immunocompromised due to the extensive medication, he takes each day. BM has been hospitalized before for viral infections not nearly as severe or contagious as COVID-19.

33.     Critically, while employed at Defendant, Plaintiff obtained his medical benefits, for himself and his family, from Defendant Faulkner.

### Pennsylvania's Response to the Pandemic, Enactment of FFCRA, and CDC-Issued Guidelines

34.     On March 6, 2020, ten states reported their first case of coronavirus: Hawaii, Utah, Nebraska, Kentucky, Indiana, Minnesota, Connecticut, South Carolina, Pennsylvania, and Oklahoma.

35.     On March 7, 2020, Pennsylvania Governor Tom Wolf announced two new positive cases in Montgomery County – both cases were related to travel within the United States.

36.     On March 10, 2020 Governor Wolf announced that all Pennsylvania schools were to close for ten days.

37.     On March 15, 2020 the Centers for Disease Control ("CDC") issued a guidance recommending against any gathering of 50 or more people for an eight-week period.

38.     On March 16, 2020, the Trump Administration issued new guidelines urging citizens to avoid social gatherings of more than *ten* people and to restrict discretionary travel.

39.     That same day, Governor Wolf extended Pennsylvania's shutdown order to the entire state (the order was originally for a few southeastern counties outside of Philadelphia).

40.     On March 18, 2020 Pennsylvania announced its first death in Northampton County following the addition of 37 new cases, bringing the total to 133 cases.

41.     That same day, the United States enacted the FFCRA, which requires certain employers to provide their employees with paid sick leave or expanded family and medical leave for specified reasons related to COVID-19.

42.     On March 24, 2020, the Wage and Hour Division (the "Division") of the U.S. Department of Labor issued additional guidance for employers and employees relating to the two paid leave provisions of the FFCRA: the Emergency Paid Sick Leave Act and the Emergency Family and Medical Leave Expansion Act.  Specifically, the FFCRA provides in relevant part:

a.  Covered employers must provide to ***all employees*** two weeks (up to 80 hours) of ***paid sick leave*** at the employee's regular rate of pay where the employee is unable to work because the employee is quarantined (pursuant to Federal, State, or local government order or advice of a health care provider), and/or experiencing COVID-19 symptoms and seeking a medical diagnosis; two weeks (up to 80 hours) of paid sick leave at two-thirds the employee's regular rate of pay because the employee is unable to work because of a bona fide need to care for an individual subject to quarantine (pursuant to Federal, State, or local government order or advice of a health care provider), or care for a child (under 18 years of age) whose school or child care provider is closed or unavailable for reasons related to COVID-19, and/or the employee is experiencing a substantially similar condition as

specified by the Secretary of Health and Human Services, in consultation with the Secretaries of the Treasury and Labor;

b.  A covered employer must provide to employees that it has employed for at least 30 day up to an additional 10 weeks of paid expanded family and medical leave at two-thirds the employee's regular rate of pay where an employee is unable to work due to a bona fide need for leave to care for a child whose school or child care provider is closed or unavailable for reasons related to COVID-19.

c.  The paid sick leave and expanded family and medical leave provisions of the FFCRA apply to certain public employers, and private employers with fewer than 500 employees.

d.  Under the FFCRA, an employee qualifies for paid sick time if the employee is unable to work (or unable to telework) due to a need for leave because the employee: (i) is subject to a Federal, State, or local quarantine or isolation order related to COVID-19; (ii) has been advised by a health care provider to self-quarantine related to COVID-19; (iii) is experiencing COVID-19 symptoms and is seeking a medical diagnosis; (iv) is caring for an individual subject to an order described in (1) or self-quarantine as described in (2); (iv) is caring for a child whose school or place of care is closed (or child care provider is unavailable) for reasons related to COVID-19; or (v) is experiencing any other substantially-similar condition specified by the Secretary of Health and Human Services, in consultation with the Secretaries of Labor and Treasury;

e.  Under the FFCRA, an employee qualifies for expanded family leave if the employee is caring for a child whose school or place of care is closed (or childcare provider is unavailable) for reasons related to COVID-19.

f.  A full-time employee may be eligible for up to 80 hours of leave, and a part-time employee is eligible for the number of hours of leave that the employee works on average over a two-week period.  If related to school or child care closures, a full-time employee is eligible for up to 12 weeks of leave at 40 hours a week, and a part-time employee is eligible for leave for the number of hours that the employee is normally scheduled to work over that period.

g.  Covered employers qualify for dollar-for-dollar reimbursement through tax credits for all qualifying wages paid under the FFCRA.

h.  Eligible employees who take leave under the Emergency FMLA Expansion Act are entitled to be restored to the position they held when the leave commenced, or to an equivalent position.  Because the Emergency FMLA Expansion Act is an amendment to the FMLA, the language of the FMLA that is unchanged, including prohibitions on discrimination and retaliation against employees for taking FMLA leave, will apply to any leave taken under the Emergency FMLA Expansion Act.

43.  That is, employers may not discharge, discipline, or otherwise discriminate against any employee who takes paid sick leave under the FFCRA.

44.  On March 19, 2020 Pennsylvania's department of education announced that all statewide assessments would be canceled for the remainder of the 2019–2020 school year.

45.     That same day, Governor Wolf ordered a statewide shutdown of "non-life sustaining businesses" by 8:00p.m. of March 20, 2020. ***This included Pennsylvania car dealerships.***

46.     On March 22, 2020 Philadelphia Mayor Jim Kenney issued a stay-at-home order for the city, set to take effect the following day at 8:00a.m.

47.     The following day, Governor Wolf issued additional stay at home orders for seven counties: Allegheny, Bucks, Chester, Delaware, Montgomery, Monroe, and a redundant order for Philadelphia County, to go into effect at 8:00p.m. the same day.

48.     By March 26, 2020, Pennsylvania had 1,687 confirmed COVID-19 cases.

49.     In or around this time, the CDC also identified certain patient populations at higher risk for serious illness with COVID-19.

50.     This included older adults (greater than age 60), and patients with lung disease, heart disease, diabetes, and in particular, high risk congenital cardiac conditions ***(i.e., patients with hypoplastic left heart syndrome, tricuspid atresia, and double inlet left ventricle).***

51.     Pursuant to CDC recommendations, high risk patients and family members were to take everyday precautions to keep space from others, to keep away from others who are sick, to limit close contact, to wash hands often, to avoid crowds as much as possible, and to stay home as much as possible to further reduce the risk of being exposed.

52.     Further, employers were advised to tell employees that if they have a cough, fever, runny nose or other cold or flu-like symptoms, they should stay at home and not risk exposing others to illness.

**Plaintiff Reports the Lack of Safety Procedures and Reasonably Requests Medical or to Work from Home Due to His Son's Medical Condition and the State Shutdown Order**

53.     In March 2020, to help combat the spread of the pandemic, Plaintiff, on his own volition, used gloves, Lysol, Clorox wipes, and other sanitary products while working at the dealership.  Plaintiff wiped down all surfaces and kept contact with others to a minimum.

54.     In or around March 10, 2020, Plaintiff posted a sign with large font on the front doors to Volvo Dealership showroom.  The signs showed the CDC guidelines for staff and customers, and asked individuals to take proper measures to keep the showroom safe and sanitary.

55.     Defendant Faulkner, inexplicably, removed the signs from the door because "it was too much to read" and "it was confusing."  Defendant Faulkner did not replace this sign or otherwise notify customers walking through the dealership's front door.

56.     Further, several of Plaintiff's co-workers and supervisors were not taking the pandemic seriously and failed to heed certain precautionary measures, including those instituted by the company.

57.     For example, although employees were advised to limit contact with each other and to refrain from entering other Faulkner showrooms, the General Manager at the GMC dealership repeatedly violated this edict.

58.     In fact, the GMC General Manager not only kept showing up at the Volvo showroom, he would work at the desks and sit in the chairs of other Volvo dealership employees, ***including Plaintiff's.***  Plaintiff immediately reported the issue to management and explained this is precisely the type of conduct that put Plaintiff and his son at risk.

59.     In addition, despite cross-contamination and constant contact with the public, Defendant Faulkner did not have the dealerships regularly cleaned.  The Volvo dealership also had no running hot water, which prevented employees from properly cleaning surfaces.

11

60.     Plaintiff no longer felt safe working at the Volvo dealership and believed he was putting his son in imminent danger by doing so.

61.     Plaintiff became increasingly concerned that his employer was not taking proper precautions to combat the spread of infection within the dealership and that certain employees were not taking precautions at all.

62.     As a result, Plaintiff reported to management that he was uncomfortable working onsite due to Defendant Faulkner's failure to implement/follow basic precautionary measures to minimize the risk of COVID-19 infections.   This complaint was ignored.

63.     Plaintiff also reasonably requested either a medical leave or a reasonable accommodation to work remotely to alleviate unnecessary risk during the pandemic to his immunocompromised son.    Both Plaintiff's request for leave and the request for an accommodation were rejected.

64.     On March 20, 2020 Pennsylvania shut down all "non-essential" business, including Defendant Faulkner.

65.     Despite the shutdown and Plaintiff's request for leave or an accommodation, Plaintiff was still ***required*** to report to work at the dealership.  Plaintiff was stunned that he could not work remotely and that he was being asked to report to the dealership in violation of an executive order issued by the Governor.

66.     On Thursday, March 26, 2020, Plaintiff complained to dealership Chief Operating Officer Tom Joyce.

67.     Plaintiff explained to Mr. Joyce that he was nervous for his son and family, that he felt the dealership was "not doing the right thing," that the dealership is not taking proper safety

and sanitary measures seriously, and that he believed it was very concerning that he was still required to come into the dealership despite the fact that all nonessential businesses were closed.

68.     In addition, Plaintiff explained to Mr. Joyce that he could easily do his job remotely and that requiring him to come to dealership put him at real risk of infection, and more importantly, put his immunocompromised son at serious risk.

69.     Plaintiff further explained that although all nonessential businesses were closed, by March 20, 2020, the dealership showroom was still open.   That is, he complained Defendant Faulkner still required Plaintiff and two other managers to report in person to the dealership showroom, which was in violation of Pennsylvania executive orders by Governor Tom Wolf. While Mr. Joyce listened to Plaintiff's concerns, neither he nor the company did anything to address them.  Nor did Defendant reconsider Plaintiff's request for leave.

70.     On March 28, 2020, Plaintiff was informed by his general manager, James Casey, that he was being furloughed.  Plaintiff was shocked by the decision – as he was one of the most senior employees and he was one of the few employees he was told that he had actually come into the showroom.  In addition, Plaintiff could easily work on sales and other dealership projects remotely.

71.     In short, Plaintiff was immediately curious as to why he was one of the employees chosen to be furloughed.  He became concerned that Defendant based his furlough on the fact he would likely need medical leave or require accommodation due to his son's medical condition.

72.     Plaintiff learned the furlough was simply pretext for something else – his unlawful termination.

73.     After learning of the decision, Plaintiff went to Mr. Casey's office to ask for clarity regarding pay, benefits, and a timeline for return to work after the furlough ended.  While Plaintiff

was in Mr. Casey's office, Mr. Casey had papers on his desk that reflected which employees were being furloughed, which employees were to remain on the payroll, and which employees were to be terminated altogether.

74.     Mr. Casey, in an effort to help Plaintiff, told Plaintiff in confidence that he should spend his time "looking for a new job."  Mr. Casey did not elaborate and did not directly say that Plaintiff was being terminated under the guise of a furlough, but he made it clear that was the case.

75.     Indeed, one of the papers left on Mr. Casey's desk reflected that all of the other managers were being furloughed with the intent of coming back but somehow Plaintiff's job was being "eliminated" and he was to be terminated for "performance" reasons, which was completely bogus.  Upon information and belief, Plaintiff was (1) the only manager who had made a request for leave and/or an accommodation due to a sick family member; (2) the only manager with a family member with a significant medical condition and costly benefits; (3) and the only manager who had voiced concerns about safety and sanitation issues at the dealership.

76.     Plaintiff immediately knew he was being terminated for voicing his concerns about the safety/sanitation issues, for requesting accommodations and medical leave due to his son's medical condition, for complaining that the rejection of his request was not reasonable, because Plaintiff would require additional accommodations as the pandemic continued, and/or because he has children with significant medical conditions and costly benefits.  In short, the pandemic presented the perfect scenario to terminate Plaintiff under the guise of a "false furlough."

77.     Indeed, well before the so-called furlough ended, Plaintiff received notice from insurance company that his "health plan" and "employer-sponsored" coverage has "ended" due to the termination of his employment.

78.     In or around the same time, due to the termination, Plaintiff also received notice of his ability to "elect COBRA continuation coverage."

79.     Plaintiff's termination occurred just days after he made a reasonable accommodation request and, in the alternative, a request for leave.

80.     Plaintiff's termination was pretextual and in retaliation for requesting leave and requesting an accommodation.

81.     Furthermore, after Plaintiff filed his EEOC complaint, Defendant Faulkner attempted to walk-back its termination of Plaintiff, claiming that he could return from furlough:

> -----Original Message-----
> From: "Dina Perreault" <dperreault@faulknertobesure.com>
> Sent: Monday, June 29, 2020 1:33pm
> To: "cmcshea@handandstone.com"
> <cmcshea@handandstone.com>
> Cc: "Pat Duffy" <pduffy@faulknerbuickgmc.com>
> Subject: Final Follow Up/ Return to Work - 6/22/20
>
> Chris,
>
> As you know, Faulkner offered you the opportunity for recall from your current furlough status and extended you additional time to accept that offer through June 26, 2020.  You have declined to accept the offer of recall.  As such, your employment will end effective June 30, 2020, as will your participation in the Supplemental Unemployment Benefits plan and in all other Company benefit plans.  You will receive information regarding your right to elect COBRA continuation of health care coverage in separate correspondence.
>
> I understand that you still have a key to the Volvo showroom in your possession. Please contact me within 7 days to return it or mail it back to me at Volvo's business address within the next 7 days.  Similarly, if you have any personal property at the dealership, please contact me to so that we may schedule a time for you to pick it up.
>
> Thank you,
> Dina

**Dina M. Perreault**
Vice President, Human Resources
The Faulkner Organization
https://link.edgepilot.com/s/1ec0b17a/6pLVtHLwo0qyBu_NIfHp1
g?u=http://www.faulknertobesure.com/
215-961-2286

82.     In reality, Defendant's offer is one of "reinstatement" and an admission of wrongdoing by the company.  In addition, Defendant Faulkner had already sent Plaintiff COBRA and other employee benefits information for terminated employees *almost two months earlier.*

83.     As a result of Defendant' discriminatory and retaliatory actions, Plaintiff will not only lose income, which is needed to care for his family, he will lose medical benefits, which are necessary for the care of his family and the treatment and care of his children.

84.     As a result of Defendant' discriminatory and retaliatory actions, Plaintiff has suffered severe emotional distress, including, but not limited to, stress, anxiety, mental anguish and dysfunction and sleeplessness.

85.     At the time of filing of Plaintiff's Complaint, the timeline of the federal, state and local governments' responses to the pandemic continued to develop and the pandemic intensified resulting in nearly 4 million cases of COVID-19 and over 144,000 deaths nationwide, legitimizing Plaintiff's health safety concerns in March 2020.

<u>**COUNT I:**</u>
<u>**VIOLATION OF THE FAMILY MEDICAL LEAVE ACT -**</u>
<u>**INTERFERENCE AND RETALIATION**</u>

86.     Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

87.     The FMLA provides certain employees with up to 12 weeks of unpaid, job-protected leave per year.

88.     Defendant Faulkner at all times relevant hereto, employs fifty (50) or more employees.

89.     Upon information and belief, Defendant, at all times relevant hereto, employ fifty (50) or more employees.

90.     Plaintiff at all times relevant hereto, had worked for at least 1,250 hours during the twelve months prior to his previously mentioned period of leave eligibility.

91.     Defendant wrongfully discharged Plaintiff in retaliation for Plaintiff requesting a reasonable accommodation and/or taking FMLA leave.

92.     Defendant unlawfully failed to reinstate Plaintiff to his former position or a comparable one in violation of the FMLA.

93.     Because of the unlawful actions undertaken by Defendant jointly or severally, Plaintiff has been and continues to suffer economic losses and pecuniary damage in the form of lost income and benefits past, present and future, and suffer unprovided medical coverage for him and his family and incur unpaid medical bills.

**WHEREFORE,** Plaintiff demands judgment against Defendant jointly or severally, for damages equal to wages, salary, employment benefits, or other compensation denied or lost, plus liquidated damages, interest, and costs of suit.

## <u>COUNT II:</u>
## <u>VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AND RETALIATION</u>

94.     Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

95.     Defendant, at all times relevant hereto, employ fifteen (15) or more employees.

96.     The ADA prohibits employers from discriminating and retaliating against employees on the basis of the disability of another person.

97.     Plaintiff at all times relevant hereto, was possessed of the requisite skill, experience, education, and other job-related requirements of his employment position with Defendant.

98.     Plaintiff could perform the essential functions of his employment position while working for Defendant.

99.     Plaintiff's son suffers from a heart condition, specifically hypoplastic left heart syndrome, tricuspid atresia, and double inlet left ventricle.

100.     Defendant discriminated against and retaliated against Plaintiff as a result of his son's medical condition by treating him differently from other employees who did not have family members with a serious medical condition.

101.     Defendant discriminated against and retaliated against Plaintiff as a result of his son's medical condition by terminating Plaintiff's employment and terminating Plaintiff's and his family's health benefits.

102.     Defendant pretextually terminated Plaintiff for voicing his concerns about the safety/sanitation issues, for requesting accommodations and medical leave due to his son's medical condition, for complaining that the rejection of his request was not reasonable and discriminatory, because Plaintiff would require additional leave and/or accommodations as the pandemic continued, and/or because he has children with significant medical conditions and costly benefits.

103.     The ADA prohibits employers from retaliating against an employee for requesting an accommodation.

104.     As a direct and proximate cause of the Defendant' unlawful acts and omissions as previously mentioned, Plaintiff has been discharged from his position of employment with Defendant Faulkner.

18

105.    Because of the unlawful actions undertaken by Defendant, jointly or severally, Plaintiff has been and continues to suffer economic losses and pecuniary damage in the form of lost income and benefits past, present and future, and suffer unprovided medical coverage for him and his family and incur unpaid medical bills.

**WHEREFORE,** Plaintiff demands judgment against Defendant jointly or severally, for damages equal to wages, salary, employment benefits, or other compensation denied or lost, plus liquidated damages, interest, and costs of suit.

## COUNT III: VIOLATIONS OF THE FFCRA

106.    Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

107.    Plaintiff, at all times relevant hereto, possessed the requisite skill, experience, education, and other job-related requirements of his employment position with Defendant.

108.    Defendant, at all times relevant hereto, employ 500 or less employees.

109.    Plaintiff could perform the essential functions of his employment position while working for Defendant.

110.    Defendant retaliated against Plaintiff by failing at all relevant times to provide him with the reasonable accommodation requested during the pandemic, but not limited to, leave time and working remotely during a pandemic.

111.    Instead, Defendant unlawfully terminated Plaintiff's employment immediately following his request for an accommodation due to the pandemic.

112.    The FFCRA prohibits employers from retaliating against an employee for requesting an accommodation, using sick leave, or asking for leave to care for a sick relative.

113.    Defendant pretextually terminated Plaintiff's employment.

114.    As a direct and proximate cause of the Defendant' unlawful acts and omissions as previously mentioned, Plaintiff has been discharged from his position of employment with Defendant.

115.    Because of the unlawful actions undertaken by Defendant, jointly or severally, Plaintiff has been and continues to suffer economic losses and pecuniary damage in the form of lost income and benefits past, present and future, and suffer unprovided medical coverage for him and his family and incur unpaid medical bills.

**WHEREFORE,** Plaintiff demands judgment against Defendant jointly or severally, for damages equal to wages, salary, employment benefits, or other compensation denied or lost, plus liquidated damages, interest, and costs of suit.

## COUNT IV:  PHRA - DISCRIMINATION DUE TO DISABILITY

116.    The preceding paragraphs are incorporated by reference as if fully set forth.

117.    The acts, failures to act, and conduct of Defendant set forth above constitute unlawful discrimination on the basis Disability in violation of Plaintiff's rights under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963

118.    Said violations were intentional and willful.

**WHEREFORE**, Plaintiff, respectfully demands judgment in his favor and against Defendant, and seeks all appropriate remedies under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

## COUNT V: PHRA - RETALIATION

119.    The preceding paragraphs are incorporated by reference as if fully set forth.

120.    The acts, failures to act, and conduct of Defendant set forth above constitute retaliation against Plaintiff for exercising his rights under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

121.    Defendant retaliated against Plaintiff for engaging in protected activities.

122.    Defendant Faulkner, by and through its employees, retaliated against Plaintiff for having exercised is rights under federal and state law.  Said violations were intentional and willful.

**WHEREFORE**, Plaintiff respectfully demands judgment in his favor and against Defendant and seeks all appropriate remedies under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

Dated: August 6, 2020             By:     **/s/ Matthew A. Luber**
                                          Matthew A. Luber, Esq.
                                          mal@njlegal.com
                                          Kelly E. Adler, Esq.
                                          kea@njlegal.com
                                          Charles J. Kocher, Esq.
                                          cjk@njlegal.com
                                          McOmber McOmber & Luber, P.C.
                                          39 East Main Street
                                          Marlton, NJ 08053
                                          (856) 985-9800 Phone
                                          *Attorneys for Plaintiff, Christopher McShea*

# Exhibit "A"

Matthew A. Luber, Esq.
  mal@njlegal.com
Kelly E. Adler, Esq.
  kea@njlegal.com
R. Armen McOmber, Esq.
  ram@njlegal.com
Peter D. Valenzano, Esq.
  pdv@njlegal.com
McOMBER McOMBER & LUBER, P.C.
39 East Main Street
Marlton, New Jersey 08053
(856) 985-9800 Phone
(856) 263-2450 Fax
*Attorneys for Charging Party, Christopher McShea*

| | |
|---|---|
| CHRISTOPHER McSHEA,<br><br>      Charging Party,<br><br>    v.<br><br>FAULKNER AND COMPANY,<br>FAULKNER AUTO GROUP, JJLH OF<br>TREVOSE INC. d/b/a FAULKNER<br>VOLVO,<br><br>      Respondents. | EQUAL EMPLOYMENT OPPORTUNITY<br>COMMISSION<br><br>CHARGE NO.:<br><br><br>**EEOC CHARGE OF DISCRIMINATION** |

Charging Party Christopher McShea ("Charging Party"), by way of an EEOC Charge of Discrimination against Respondents Faulkner and Company, Faulkner Auto Group, and JJLH of Trevose Inc. d/b/a Faulkner Volvo (collectively "Respondents" or "Respondent Faulkner") alleges as follows:

## **INTRODUCTION**

1.  This case concerns an employer focusing on its bottom-line and turning its back on an employee at the time the employee needed its support and employer-based medical insurance the most.  With an immunocompromised child at home, on any given day, Charging Party and his family must take significant precautionary measures to ensure they do not encounter individuals

1

or surfaces that could spread infectious disease.  This concern was significantly amplified by the recent COVID-19 pandemic, which, in March 2020, began to precipitously intensify in Pennsylvania and across the United States.  As a result, Charging Party, a sales manager employed by Respondents for more than 15 years, made several requests to management to work from home to avoid unnecessary contact with members of the public and co-workers who could potentially transmit the virus to Charging Party and, in turn, to his son.  As discussed below, not only did Respondents reject Charging Party's reasonable accommodation request, neither the dealership nor management took proper precautions to avert the spread of the virus among employees and they forced him to continue to come to work **on site** as the pandemic escalated and even **after** Pennsylvania had ordered all non-essential business, including Respondents, to be shutdown.

2.     Even worse, after Charging Party continued to voice his concerns regarding Respondents' internal handling of the pandemic and his accommodation request, the company suddenly terminated his employment under the guise he was being temporarily "furloughed" and in a deliberate effort hide the true reason for his termination – unlawful discrimination and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. 2601, ("FMLA"), Americans with Disabilities Act, 42 U.S.C. § 12101, et seq ("ADA"), Families First Coronavirus Response Act, PL 116-127 ("FFCRA"), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 ("PHRA").   Respondent Faulkner's conduct not only is shameful, it is against the law. Charging Party accordingly brings this Charge.

## **PARTIES**

3.     Charging Party is an individual residing at 17 Kirkwood Road, Gibbsboro, New Jersey 08026.  At all relevant times, Charging Party was employed by Respondent Faulkner as a

2

Sales Team Manager at the Volvo dealership located at 4429 Street Rd, Feasterville-Trevose, PA 19053.

4.      Respondent Faulkner is headquartered in Pennsylvania.   At all times relevant hereto, Charging Party worked at Respondent Faulkner's location 4429 Street Rd, Feasterville-Trevose, PA 19053.  Respondent Faulkner is an "employer" as defined by the FMLA, ADA, and FFCRA.

## FACTS COMMON TO ALL CLAIMS

5.      Charging Party repeats each and every allegation set forth above as if set forth fully herein at length.

6.      The EEOC enforces workplace anti-discrimination and -retaliation laws including those under the FMLA, ADA, and FFCRA.

7.      Respondent Faulkner is subject to the FMLA, ADA, and FFCRA.

8.      Respondent Faulkner employs more than 500 employees.

9.      Respondent Faulkner is a family-owned group of automotive dealerships serving the Philadelphia, Bucks County, Harrisburg, and Huntingdon Valley, Pennsylvania areas.

10.      Although Respondent Faulkner boasts "our family extends beyond the Faulkner family—Our employees and customers are treated as part of our family. We're proud to serve communities across Central and Southeastern Pennsylvania the best vehicles and service," the company pretextually terminated Charging Party's employment immediately after (i) he reported he was uncomfortable working onsite due to Respondent Faulkner's failure to implement/follow basic precautionary measures to minimize the risk of COVID-19 infections, and/or (ii) he reasonably requested an accommodation to work remotely to alleviate unnecessary risk to himself during the pandemic and to his immunocompromised son.

3

11.     Respondent Faulkner also engaged in a concerted effort to mask the discrimination and retaliation by "furloughing" Charging Party as a result of the coronavirus pandemic when, in reality, the company had already made the decision to terminate him under the guise of poor "performance."

### Charging Party's Employment with Faulkner--Generally

12.     Charging Party had been employed with Respondent Faulkner for approximately 15 years prior to his termination in March 2020.

13.     Charging Party was an excellent employee with positive reviews and no disciplinary history.

14.     Charging Party was employed as the Finance Director at Respondent Faulkner's Toyota dealership form 2010 through 2013. In that position, Charging Party's duties included procuring finance applications, improving net dollars on finance deals, assisting with the sale of insurance products, and training finance managers within his department.

15.     In 2013, Charging Party was transferred to the "New Car Department," where he handled vehicle allocation from the manufacturer, strived to improve gross dollars per vehicle sale, trained sales personnel, and improved overall sales for the Toyota dealership.

16.     In October of 2017, Charging Party was again transferred to the Faulkner Volvo dealership to become the Sales Manager.  At the time of his transfer, the Faulkner Volvo dealership had struggling sales, did not have a finance manager, and did not have a stable General Manager. This required Charging Party himself to complete customer paperwork, report deals to the bank, obtain contract approval, and sell insurance related products, among other things.

17.     Charging Party was one of the few key employees at the dealership that could handle front-end sales, back-end financing, and manufacturing work.

4

18.     During his tenure as Sales Manager for the Volvo dealership, Charging Party was able to double the dealership's average monthly sales.

19.     As a result, Faulkner Volvo won the "Excellence Award" in 2018 and 2019, a mark achieved by only 30 dealerships across the United States.

**Charging Party's Son's Medication Condition**

20.     Charging Party's six-year-old son, ("BM") has Hypoplastic Left Heart Syndrome ("HLHS"), a rare medical condition and congenital birth defect where the left side of the heart is either not developed or is underdeveloped.

21.     As a result of the condition, the left side of BM's heart is unable to effectively pump blood to the body. Instead, the right side of the heart must pump blood to the lungs and to the rest of the body.

22.     Significant daily medication is necessary to prevent closure of the connection (ductus arteriosus) between the right and left sides, followed by either surgery or a heart transplant, in order to treat hypoplastic left heart syndrome.

23.     Due to HLHS, BM has already endured three open heart surgeries, multiple cardiac catheterizations, a lymphatic procedure, plural effusions, and the development of PLE (protein loss enteropathy), among other complications.

24.     BM takes six medications daily, which are necessary for palliative care and his survival.

25.     One of BM's medications must be obtained through a specialty pharmacy and the medication costs approximately $6,000 per month.

26.     As a result of BM's medical condition, on a daily basis, Charging Party and other members of his family have no choice but to mitigate against germs, bacteria, and other substances

that could transmit or lead to infection.  That is, irrespective of a pandemic, BM was particularly vulnerable to viral infections.

27.     In addition to HLHS, BM is immunocompromised due to the extensive medication, he takes each day. BM has been hospitalized before for viral infections not nearly as severe or contagious as COVID-19.

28.     Critically, while employed at Respondents, Charging Party obtained his medical benefits, for himself and his family, from Respondent Faulkner.

### Pennsylvania's Response to the Pandemic, Enactment of FFCRA, and CDC-Issued Guidelines

29.     On March 6, 2020, ten states reported their first case of coronavirus: Hawaii, Utah, Nebraska, Kentucky, Indiana, Minnesota, Connecticut, South Carolina, Pennsylvania, and Oklahoma.

30.     On March 7, 2020, Pennsylvania Governor Tom Wolf announced two new positive cases in Montgomery County – both cases were related to travel within the United States.

31.     On March 10, 2020 Governor Wolf announced that all Pennsylvania schools were to close for ten days.

32.     On March 15, 2020 the Centers for Disease Control ("CDC") issued a guidance recommending against any gathering of 50 or more people for an eight-week period.

33.     On March 16, 2020, the Trump Administration issued new guidelines urging citizens to avoid social gatherings of more than *ten* people and to restrict discretionary travel.

34.     That same day, Governor Wolf extended Pennsylvania's shutdown order to the entire state (the order was originally for a few southeastern counties outside of Philadelphia).

35.     On March 18, 2020 Pennsylvania announced its first death in Northampton County following the addition of 37 new cases, bringing the total to 133 cases.

6

36.     That same day, the United States enacted the FFCRA, which requires certain employers to provide their employees with paid sick leave or expanded family and medical leave for specified reasons related to COVID-19.

37.     On March 24, 2020, the Wage and Hour Division (the "Division") of the U.S. Department of Labor issued additional guidance for employers and employees relating to the two paid leave provisions of the FFCRA: the Emergency Paid Sick Leave Act and the Emergency Family and Medical Leave Expansion Act.  Specifically, the FFCRA provides in relevant part:

a.     Covered employers must provide to ***all employees*** two weeks (up to 80 hours) of ***paid sick leave*** at the employee's regular rate of pay where the employee is unable to work because the employee is quarantined (pursuant to Federal, State, or local government order or advice of a health care provider), and/or experiencing COVID-19 symptoms and seeking a medical diagnosis; two weeks (up to 80 hours) of paid sick leave at two-thirds the employee's regular rate of pay because the employee is unable to work because of a bona fide need to care for an individual subject to quarantine (pursuant to Federal, State, or local government order or advice of a health care provider), or care for a child (under 18 years of age) whose school or child care provider is closed or unavailable for reasons related to COVID-19, and/or the employee is experiencing a substantially similar condition as specified by the Secretary of Health and Human Services, in consultation with the Secretaries of the Treasury and Labor;

b.     A covered employer must provide to employees that it has employed for at least 30 day up to an additional 10 weeks of paid expanded family and medical leave at two-thirds the employee's regular rate of pay where an employee is unable to work due

to a bona fide need for leave to care for a child whose school or child care provider is closed or unavailable for reasons related to COVID-19.

c.  The paid sick leave and expanded family and medical leave provisions of the FFCRA apply to certain public employers, and private employers with fewer than 500 employees.

d.  Under the FFCRA, an employee qualifies for paid sick time if the employee is unable to work (or unable to telework) due to a need for leave because the employee: (i) is subject to a Federal, State, or local quarantine or isolation order related to COVID-19; (ii) has been advised by a health care provider to self-quarantine related to COVID-19; (iii) is experiencing COVID-19 symptoms and is seeking a medical diagnosis; (iv) is caring for an individual subject to an order described in (1) or self-quarantine as described in (2); (iv) is caring for a child whose school or place of care is closed (or child care provider is unavailable) for reasons related to COVID-19; or (v) is experiencing any other substantially-similar condition specified by the Secretary of Health and Human Services, in consultation with the Secretaries of Labor and Treasury;

e.  Under the FFCRA, an employee qualifies for expanded family leave if the employee is caring for a child whose school or place of care is closed (or childcare provider is unavailable) for reasons related to COVID-19.

f.  A full-time employee may be eligible for up to 80 hours of leave, and a part-time employee is eligible for the number of hours of leave that the employee works on average over a two-week period.  If related to school or child care closures, a full-time employee is eligible for up to 12 weeks of leave at 40 hours a week, and a part-

time employee is eligible for leave for the number of hours that the employee is normally scheduled to work over that period.

g.  Covered employers qualify for dollar-for-dollar reimbursement through tax credits for all qualifying wages paid under the FFCRA.

h.  Eligible employees who take leave under the Emergency FMLA Expansion Act are entitled to be restored to the position they held when the leave commenced, or to an equivalent position.  Because the Emergency FMLA Expansion Act is an amendment to the FMLA, the language of the FMLA that is unchanged, including prohibitions on discrimination and retaliation against employees for taking FMLA leave, will apply to any leave taken under the Emergency FMLA Expansion Act.

38.  That is, employers may not discharge, discipline, or otherwise discriminate against any employee who takes paid sick leave under the FFCRA.

39.  On March 19, 2020 Pennsylvania's department of education announced that all statewide assessments would be canceled for the remainder of the 2019–2020 school year.

40.  That same day, Governor Wolf ordered a statewide shutdown of "non-life sustaining businesses" by 8:00p.m. of March 20, 2020. ***This included Pennsylvania car dealerships.***

41.  On March 22, 2020 Philadelphia Mayor Jim Kenney issued a stay-at-home order for the city, set to take effect the following day at 8:00a.m.

42.  The following day, Governor Wolf issued additional stay at home orders for seven counties: Allegheny, Bucks, Chester, Delaware, Montgomery, Monroe, and a redundant order for Philadelphia County, to go into effect at 8:00p.m. the same day.

43.  By March 26, 2020, Pennsylvania had 1,687 confirmed COVID-19 cases.

44.     In or around this time, the CDC also identified certain patient populations at higher risk for serious illness with COVID-19.

45.     This included older adults (greater than age 60), and patients with lung disease, heart disease, diabetes, and in particular, high risk congenital cardiac conditions *(i.e., patients with hypoplastic left heart syndrome, tricuspid atresia, and double inlet left ventricle).*

46.     Pursuant to CDC recommendations, high risk patients and family members were to take everyday precautions to keep space from others, to keep away from others who are sick, to limit close contact, to wash hands often, to avoid crowds as much as possible, and to stay home as much as possible to further reduce the risk of being exposed.

47.     Further, employers were advised to tell employees that if they have a cough, fever, runny nose or other cold or flu-like symptoms, they should stay at home and not risk exposing others to illness.

### Charging Party Reports the Lack of Safety Procedures and Reasonably Requests to Work from Home Due to His Son's Medical Condition and the State Shutdown Order

48.     In March 2020, to help combat the spread of the pandemic, Charging Party, on his own volition, used gloves, Lysol, Clorox wipes, and other sanitary products while working at the dealership.  Charging Party wiped down all surfaces and kept contact with others to a minimum.

49.     In or around March 10, 2020, Charging Party posted a sign with large font on the front doors to Volvo Dealership showroom.  The signs showed the CDC guidelines for staff and customers, and asked individuals to take proper measures to keep the showroom safe and sanitary.

50.     Respondent Faulkner, inexplicably, removed the signs from the door because "it was too much to read" and "it was confusing."  Respondent Faulkner did not replace this sign or otherwise notify customers walking through the dealership's front door.

51.     Further, several of Plaintiff's co-workers and supervisors were not taking the pandemic seriously and failed to heed certain precautionary measures, including those instituted by the company.

52.     For example, although employees were advised to limit contact with each other and to refrain from entering other Faulkner showrooms, the General Manager at the GMC dealership repeatedly violated this edict.

53.     In fact, the GMC General Manager not only kept showing up at the Volvo showroom, he would work at the desks and sit in the chairs of other Volvo dealership employees, *including Charging Party's.*  Charging Party immediately reported the issue to management and explained this is precisely the type of conduct that put Claimant and his son at risk.

54.     In addition, despite cross-contamination and constant contact with the public, Respondent Faulkner did not have the dealerships regularly cleaned.  The Volvo dealership also had no running hot water, which prevented employees from properly cleaning surfaces.

55.     Charging Party no longer felt safe working at the Volvo dealership and believed he was putting his son in imminent danger by doing so.

56.     Charging Party became increasingly concerned that his employer was not taking proper precautions to combat the spread of infection within the dealership and that certain employees were not taking precautions at all.

57.     As a result, Charging Party reported to management that he was uncomfortable working onsite due to Respondent Faulkner's failure to implement/follow basic precautionary measures to minimize the risk of COVID-19 infections.   This complaint was ignored.

58.     Charging Party also reasonably requested an accommodation to work remotely to alleviate unnecessary risk during the pandemic to his immunocompromised son.   This request was rejected.

59.     On March 20, 2020 Pennsylvania shut down all "non-essential" business, including Respondent Faulkner.

60.     Despite the shutdown, Charging Party was still *required* to report to work at the dealership.  Charging Party was stunned that he could not work remotely and that he was being asked to report to the dealership in violation of an executive order issued by the Governor.

61.     On Thursday, March 26, 2020, Charging Party complained to dealership Chief Operating Officer Tom Joyce.

62.     Charging Party explained to Mr. Joyce that he was nervous for his son and family, that he felt the dealership was "not doing the right thing," that the dealership is not taking proper safety and sanitary measures seriously, and that he believed it was very concerning that he was still required to come into the dealership despite the fact that all nonessential businesses were closed.

63.     In addition, Charging Party explained to Mr. Joyce that he could easily do his job remotely and that requiring him to come to dealership put him at real risk of infection, and more importantly, put his immunocompromised son at serious risk.

64.     Charging Party further explained that although all nonessential businesses were closed, by March 20, 2020, the dealership showroom was still open.  That is, he complained Respondent Faulkner still required Charging Party and two other managers to report in person to the dealership showroom, which was in violation of Pennsylvania executive orders by Governor

Tom Wolf.  While Mr. Joyce listened to Charging Party's concerns, neither he nor the company did anything to address them.

65.     On March 28, 2020, Charging Party was informed by his general manager, James Casey, that he was being furloughed.  Charging Party was shocked by the decision – as he was one of the most senior employees and he was one of the few employees he was told that he had actually come into the showroom.  In addition, Charging Party could easily work on sales and other dealership projects remotely.

66.     In short, Charging Party was immediately curious as to why he was one of the employees chosen to be furloughed.  He became concerned that Respondents based his furlough on the fact he would likely need leave or require accommodation due to his son's medical condition.

67.     Charging Party learned the furlough was simply pretext for something else – his unlawful termination.

68.     After learning of the decision, Charging Party went to Mr. Casey's office to ask for clarity regarding pay, benefits, and a timeline for return to work after the furlough ended.  While Charging Party was in Mr. Casey's office, Mr. Casey had papers on his desk that reflected which employees were being furloughed, which employees were to remain on the payroll, and which employees were to be terminated altogether.

69.     Mr. Casey, in an effort to help Charging Party, told Charging Party in confidence that he should spend his time "looking for a new job."  Mr. Casey did not elaborate and did not directly say that Charging Party was being terminated under the guise of a furlough, but he made it clear that was the case.

70.     Indeed, one of the papers left on Mr. Casey's desk reflected that all of the other managers were being furloughed with the intent of coming back but somehow Charging Party's job was being "eliminated" and he was to be terminated for "performance" reasons, which was completely bogus.

71.     Charging Party immediately knew he was being terminated for voicing his concerns about the safety/sanitation issues, for requesting accommodations due to his son's medical condition, for complaining that the rejection of his request was not reasonable, because Charging Party would require additional accommodations as the pandemic continued, and/or because he has children with significant medical conditions and costly benefits.  In short, the pandemic presented the perfect scenario to terminate Charging Party under the guise of a "false furlough."

72.     Charging Party's termination occurred just days after he made a reasonable accommodation request.

73.     Charging Party's termination was pretextual and in retaliation for requesting leave and requesting an accommodation.

74.     As a result of Defendants' discriminatory and retaliatory actions, Charging Party will not only lose income, which is needed to care for his family, he will lose medical benefits, which are necessary for the care of his family and the treatment and care of his children.

75.     As a result of Defendants' discriminatory and retaliatory actions, Charging Party has suffered severe emotional distress, including, but not limited to, stress, anxiety, mental anguish and dysfunction and sleeplessness.

<u>**COUNT I**</u>
**VIOLATION OF THE FAMILY MEDICAL LEAVE ACT -
INTERFERENCE AND RETALIATION
(As to all Respondents)**

76.     Charging Party repeats each and every allegation set forth above as if set forth fully herein at length.

77.     The FMLA provides certain employees with up to 12 weeks of unpaid, job-protected leave per year.

78.     Respondent Faulkner at all times relevant hereto, employs fifty (50) or more employees.

79.     Upon information and belief, Respondents, at all times relevant hereto, employ fifty (50) or more employees.

80.     Charging Party at all times relevant hereto, had worked for at least 1,250 hours during the twelve months prior to his previously mentioned period of leave eligibility.

81.     Respondents wrongfully discharged Charging Party in retaliation for Charging Party requesting a reasonable accommodation and/or taking FMLA leave.

82.     Respondents unlawfully failed to reinstate Charging Party to his former position or a comparable one in violation of the FMLA.

83.     Because of the unlawful actions undertaken by Respondents jointly or severally, Charging Party has been and continues to suffer economic losses and pecuniary damage in the form of lost income and benefits past, present and future, and suffer unprovided medical coverage for him and his family and incur unpaid medical bills.

**WHEREFORE,** Charging Party demands judgment against Respondents jointly or severally, for damages equal to wages, salary, employment benefits, or other compensation denied or lost, plus liquidated damages, interest, and costs of suit.

<u>**COUNT II**</u>
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT – FAILURE TO
ACCOMMODATE, DISCRIMINATION AND RETALIATION
(Against All Defendants)**

84.     Charging Party repeats each and every allegation set forth above as if set forth fully herein at length.

85.     Respondents, at all times relevant hereto, employ fifteen (15) or more employees.

86.     The ADA requires that employers provide reasonable accommodations for the disabled.

87.     Charging Party at all times relevant hereto, was possessed of the requisite skill, experience, education, and other job-related requirements of his employment position with Respondents.

88.     Charging Party could perform the essential functions of his employment position while working for Respondents.

89.     Respondents discriminated against Charging Party by failing at all relevant times to provide him with the reasonable accommodation requested in violation of the ADA including, but not limited to, additional leave time and working remotely during a pandemic.

90.     It is the duty of an employer to engage a qualified employee in good faith in an inter-active process to determine if a reasonable accommodation can be accorded a disabled employee without resulting in undue prejudice to the employer.

91.     Respondents discriminated against Charging Party by failing to engage him in good faith in an interactive process to determine if continued leave was a reasonable accommodation. Instead, Respondents unlawfully terminated Charging Party's employment immediately following his request for an accommodation.

16

92.     The ADA prohibits employers from retaliating against an employee for requesting an accommodation.

93.     Respondents pretextually terminated Charging Party's employment as a result of Charging Party's request for an accommodation.

94.     The ADA prohibits employers from discrimination against an employee on the basis of the employee's disability.

95.     Respondents pretextually terminated Charging Party's employment as a result of Charging Party's request for an accommodation.

96.     As a direct and proximate cause of the Respondents' unlawful acts and omissions as previously mentioned, Charging Party has been discharged from his position of employment with Respondent Faulkner.

97.     Because of the unlawful actions undertaken by Respondents, jointly or severally, Charging Party has been and continues to suffer economic losses and pecuniary damage in the form of lost income and benefits past, present and future, and suffer unprovided medical coverage for him and his family and incur unpaid medical bills.

**WHEREFORE,** Charging Party demands judgment against Respondents jointly or severally, for damages equal to wages, salary, employment benefits, or other compensation denied or lost, plus liquidated damages, interest, and costs of suit.

### COUNT III
### VIOLATIONS OF THE FFCRA
### (Against All Defendants)

98.     Charging Party repeats each and every allegation set forth above as if set forth fully herein at length.

99.     Charging Party, at all times relevant hereto, possessed the requisite skill, experience, education, and other job-related requirements of his employment position with Respondents.

100.     Charging Party could perform the essential functions of his employment position while working for Respondents.

101.     Respondents retaliated against Charging Party by failing at all relevant times to provide him with the reasonable accommodation requested during the pandemic, but not limited to, leave time and working remotely during a pandemic.

102.     Instead, Respondents unlawfully terminated Charging Party's employment immediately following his request for an accommodation due to the pandemic.

103.     The FFCRA prohibits employers from retaliating against an employee for requesting an accommodation, using sick leave, or asking for leave to care for a sick relative..

104.     Respondents pretextually terminated Charging Party's employment.

105.     As a direct and proximate cause of the Respondents' unlawful acts and omissions as previously mentioned, Charging Party has been discharged from his position of employment with Respondents.

106.     Because of the unlawful actions undertaken by Respondents, jointly or severally, Charging Party has been and continues to suffer economic losses and pecuniary damage in the form of lost income and benefits past, present and future, and suffer unprovided medical coverage for him and his family and incur unpaid medical bills.

**WHEREFORE,** Charging Party demands judgment against Respondents jointly or severally, for damages equal to wages, salary, employment benefits, or other compensation denied or lost, plus liquidated damages, interest, and costs of suit.

Dated: April 15, 2020   BY: /s/ Matthew A. Luber
             Matthew A. Luber, Esq.
             mal@njlegal.com
             Kelly E. Adler, Esq.
             kea@njlegal.com
             R. Armen McOmber, Esq.
             ram@njlegal.com
             Peter D. Valenzano, Esq.
             pdv@njlegal.com
             McOmber McOmber & Luber, P.C.
             39 East Main Street
             Marlton, New Jersey 08053
             (856) 985-9800 Phone
             (856) 263-2450 Fax
             *Attorneys for Charging Party, Christopher McShea*

**I declare under penalty of perjury that the above is true and correct.**

Dated:  April 15, 2020   BY: ***/s/ Christopher McShea***
             Christopher McShea
             Charging Party Signature

19

# Exhibit "B"

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: **Christopher McShea**<br>**17 Kirkwood Road**<br>**Gibbsboro, NJ 08026** | From: **Philadelphia District Office**<br>**801 Market Street**<br>**Suite 1000**<br>**Philadelphia, PA 19107** |

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **530-2020-04209** | **Legal Unit,**<br>**Legal Technician** | **(267) 589-9700** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Jamie R. Williamson*

July 22, 2020

_____          _____
**Jamie R. Williamson,**                          *(Date Mailed)*
**District Director**

cc:

| | |
|---|---|
| **Kelley Kaufman, Esq.**<br>**McNees Wallace & Nurick LLC**<br>**100 Pine Street**<br>**Harrisburg, PA 17101** | **Matthew Luber, Esq.**<br>**MCOMBER, MCOMBER & LUBER**<br>**39 E Main Street**<br>**Marlton, NJ 08053** |